## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

CIVIL NO. 09-2102 (JRT/AJB)

STREAMBEND PROPERTIES, LLC,

PLAINTIFF,

v.

THE CARLYLE CONDOS, LLC, OPUS
NORTHWEST, LLC,

DEFENDANTS.

**ORDER**
AND
**REPORT & RECOMMENDATION**

Jonathan L. R. Drewes, **DREWES LAW, PLLC**, 1516 West Lake Street, Suite 400, Minneapolis, MN 55408, for Plaintiff.

Jon L. Farnsworth, Marnie E. Fearon & Stephen E. Yoch, **FELHABER, LARSON, FENLON & VOGT**, PA, 444 Cedar Street, Suite 2100, St Paul, MN 55101, for Defendants.

## I.    INTRODUCTION

This matter is before the Court, Chief Magistrate Judge Arthur J. Boylan, on Plaintiff's Partial Motion for Summary Judgment [Docket No. 62]. This action has been referred to the magistrate judge for report and recommendation to the district court under 28 U.S.C. § 636 and Local Rule 72.2(b). [Docket No. 93.] A hearing was held on the motion on March 7, 2011. Jonathan L. R. Drewes appeared on behalf of Plaintiff.  Jon L. Farnsworth and Stephen E. Yoch appeared on behalf of Defendants.

For the reasons set forth below**, IT IS HEREBY ORDERED** that Defendants' Objection to Plaintiff's Reply Brief is **GRANTED IN PART** and **DENIED IN PART** [Docket No. 76];

and Declaration of Jonathan L. R. Drewes and Exhibits [Docket No. 75] are **STRICKEN**; **IT IS HEREBY RECOMMENDED** that Plaintiff's Partial Motion for Summary Judgment [Docket No. 62] be **DENIED**; and Counts I, II, VII, and VIII be **DISMISSED WITH PREJUDICE**.

## II.   FACTUAL BACKGROUND

### a.  Factual Background

Plaintiff Streambend Properties, LLC (Streambend) is a limited liability company that was established by Jerald Hammann (Hammann).   Defendants The Carlyle Condos, LLC (Carlyle) and Opus Northwest, LLC (Opus) are the seller and developer, respectively, of a condominium complex located in downtown Minneapolis, Minnesota, which is called The Carlyle. This action arises out of a condominium unit Purchase Agreement between Streambend and Carlyle. The following facts are undisputed unless otherwise noted.

### i.  Representations Concerning the Unit

In June 2004, The Carlyle had not been constructed. Streambend acquired a "Pre-Grand Opening Event" packet, which was dated June 26, 2004. (Aff. of Docs. Exs. 1, ¶ 5 & 4, Dec. 16, 2009.) The packet included price ranges for the condominium-unit types and unit floor-plan diagrams. (*Id.* at Ex. 4.)  The packet described three types of units, each with different sub-styles. This case concerns "Classic Residences," which were located between the fifth and thirtieth floors. (*Id.*)

The packet described "The Lewis" style Classic Residence as a two-bedroom, two-bath unit, priced from $321,900 to $453,090. (*Id.*) The total area of the interior of The Lewis was 1,202 square feet. (*Id.*) The total area of the exterior (balcony) was 76 square feet. (*Id.*) The combined total area for the entire unit was 1,278 square feet. (*Id.*) The provided dimensions of The Lewis were as follows:

| Room | Dimensions |
|------|-----------|
| Master Bedroom | 12'-5" x 12'-10" |
| Bedroom 2 | 12'-2" x 11'-0" |
| Living/Dining Room | 21'-4" x 12'-7" |
| Kitchen | 13'-6" x 11'-0" |

(*Id.*)

The packet also described "The Emerson" style Classic Residence as a two-bedroom, two-bath unit, priced from $321,900 to $453,090. (*Id.*) The total area of the interior of The Emerson was 1,352 square feet. (*Id.*) The total area of the exterior was 74 square feet. (*Id.*) The combined total square footage for the entire unit was 1,426. (*Id.*) The provided dimensions of The Emerson were as follows:

| Room | Dimensions |
|------|-----------|
| Master Bedroom | 14'-0" x 12'-0" |
| Bedroom 2 | 11'-0" x 13'-0" |
| Living/Dining Room | 14'-0" x 13'-0" |
| Kitchen | 13'-10" x 8'-4" |
| Dining | 11'-0" x 12'-0" |

(*Id.*)

The packet stated that prices were subject to change without notice and each page providing the dimensions of the unit styles included the following language: "The Carlyle, LLC's policy of continual attention to design and construction requires that all specifications, equipment, landscape plans, dimensions and prices are subject to change without notice." (*Id.*)

"Opus constructed a model of a condominium unit to facilitate the sales process." (Compl. ¶ 49, Aug. 9, 2009; Answer ¶ 36, Sept. 8, 2009.) "The model unit was of a floor plan

3

titled 'Emerson' . . . ."[1] (Compl. at ¶ 52; Answer at ¶ 39.) The window in the master bedroom of

the "as-built Emerson floor plan unit" had a rough opening of 80 inches by 72 inches, and

fabricated dimensions of 77-1/4 inches by 70-3/4 inches. (Aff. of Docs. at Ex. 2.) The two

windows in the living/dining room of the "as-built Emerson floor plan unit" had a rough opening

of 85 inches by 108 inches, and actual fabricated dimensions of 86 inches by 106-3/4 inches.

(*Id.*)

On June 26, 2004, Hammann entered into a reservation agreement with Carlyle for the

purchase of Unit 2904 within The Carlyle for $422,198. (Aff. of Docs. at Ex. 3.) Hammann paid

a deposit of $2,500. (*Id.*) The Reservation Agreement stated: "The Deposit reserves for Buyer

the residential unit number as identified above [(i.e., Unit 2904)] in The Carlyle, which unit is

identified and is shown on the proposed floor plan for the unit given to Buyer." (*Id.*) Hammann

stated in his Affidavit that "as Chief Manager of Streambend" he relied upon the packet, "model

home depictions and representations in making Streambend's investment decision." (*Id.* at Ex. 1,

¶ 6.)

### ii.  The Purchase Agreement

A pre-construction Purchase Agreement for Unit 2904 in The Carlyle was executed by

Carlyle and Hammann, on behalf of Streambend, in August 2004.[2] (Compl. Ex. 1, Aug. 8, 2009;

Docket No. 1-1.) The Purchase Agreement identified the Unit as Seller's Model Lewis, which

was to be constructed in accordance with specifications attached as "Exhibit A" to the Purchase

Agreement and was "subject to modifications due to substitutions or Buyer's interior design

---

[1] Streambend alleges that "the actual  square footage of the model was approximately
1,225 square feet" and "[t]he model was similar in size to the 1202 square footage of Unit 2904
as represented to Streambend." (Compl. at ¶¶ 50-51.)

[2] Streambend also acknowledged that it received a "Declaration of the Carlyle" at time
that Hammann signed the Purchase Agreement on Streambend's behalf. (Aff. of Docs. at Ex. 8.)
This document is not part of the record.

selections and change orders." (Compl. at ¶ 2.) The agreement stated a base unit purchase price of $422,198. (*Id.* at ¶ 3.) Pursuant to the agreement, Streambend made a $21,100 earnest money payment. (*Id.*) In March 2005, the agreement was amended to include the purchase of an additional parking stall for $29,500 (Compl. Ex. 1), and in consideration of the unit changes requested by Streambend, the final sale price for Unit 2904 was $499,938, and Streambend paid an additional $9,648 in earnest money. (Answer at ¶ 12.) Therefore, earnest money payments totaled $30,748.

The Purchase Agreement stated in part as follows:

> **4. Closing.** The date of the closing of this transaction (the "Date of Closing") shall be within ten business days following the date of substantial completion of the Unit. . . . The closing shall take place at a time designated by Seller . . . .

> **5. Impoundment of Buyer Earnest Money.** . . .[A]ll earnest money payments made by Buyer to Seller under this Agreement prior to the Date of Closing shall be deposited with the Title Company under the terms of an Impoundment Agreement satisfying the requirements of Minnesota Statutes Section 515B.4-109 . . . .

> . . . .

> **8. Variation or Substitution.** Some of the improvements to the Unit or common elements may vary from the plans and specifications as to brand and actual dimensions, but shall be constructed substantially as reflected in the plans and specifications. Buyer grants Seller the right to make substitutions or changes in the Unit or common elements as required due to government requirements, unavailability of materials or other changes beyond Seller's control as long as the changes do not materially and adversely affect design or quality or increase Buyer's cost.

> . . . .

> **11. Title and Examination.** In lieu of any other evidence of title, Seller shall, within a reasonable time prior to the date of Closing, provide Buyer with a commitment for an American Land Title

Association ("ALTA") owner's policy of title insurance . . . issued by the Title Company . . . .

. . . .

**19. Inspection/Site Access.** Before the Date of Closing, Seller shall arrange for Buyer to inspect the Unit, on a date and at a time reasonably agreeable to Buyer and Seller, to assure that the Unit complies with this Agreement. Any incomplete or defective items which do not materially and adversely affect the habitability of the Unit shall not be grounds to delay the closing . . . .

**20. Default and Remedies**

A. If Buyer defaults under this Agreement, and if Buyer fails to cure the default within 20 days after receiving written notice from Seller describing (i) the default and (ii) the conditions reasonably required to cure the default, then Seller may terminate this Agreement immediately by giving notice to Buyer within 10 days after the expiration of Buyer's 20-day cure period. Notwithstanding the foregoing, if Buyer's default involves a failure to attend and consummate the closing on the Date of Closing scheduled by Seller, then Seller may terminate this Agreement immediately.  In any such event, the earnest money and deposits paid by Buyer to Seller shall be retained by Seller as liquidated damages. . . .

B. If Seller defaults under this Agreement, and if Seller fails to cure the default within 10 days after receiving written notice from Buyer describing (i) the default and (ii) the conditions reasonably required to cure the default, then Buyer may terminate this Agreement immediately by giving notice to Seller within 10 days after the expiration of Seller's 10-day cure period, in which event all earnest money and deposits paid by Buyer shall be promptly refunded to Buyer.

C. The foregoing remedies shall constitute the exclusive remedies for Buyer and Seller in the event of default under this Agreement prior to the Date of Closing.  If, following termination of this Agreement, Seller is required to cancel this Agreement pursuant to statute due to Buyer's failure to release any purported interest in the Property, the notice period referred to in Minnesota Statutes Section 559.21 shall be 30 days.

**25. Entire Agreement/Addenda.** This Agreement, and any Addenda to this Agreement . . . constitute the entire Agreement by and between the parties, and supersede any other verbal or written

representations, promises, agreements or understandings between the parties and their respective agents or representatives.

**26. Assignment Restricted.** Buyer shall not assign, transfer or convey any interest in this Agreement or in the Unit, nor agree to do so, without the prior written consent of Seller, which may be given or withheld in Seller's sole discretion.

(Compl. at Ex. 1; Docket No. 1-1.)

Attached to the Purchase Agreement was "Exhibit A," which was entitled, "The Classic Residences . . . Outline Specifications." (*Id.*) Exhibit A describes the construction of the tower and features of the unit. Exhibit A also included a paragraph noting that the dimensions "may vary slightly" and total square footage in each residence is "approximate." (*Id.*)

### iii.   Construction and Modifications

Carlyle sent Streambend a letter dated November 30, 2006. (Aff. of Docs., at Ex. 10.) The letter stated that The Carlyle Declaration was modified. (*Id.*) The Declaration was modified to authorize the owner and tenants of the retail space located along Third Avenue and Second Street to utilize up to six of the licensed garage stalls in The Carlyle parking ramp. (*Id.*) Tom Dillon, manager of The Carlyle through the period of the execution of the Purchase Agreement and August 30, 2007, stated in his affidavit that the original dues for Unit 2904 were projected to be near $600 per month and the amended budget provided that Unit 2904's association dues would be approximately $625 per month. (Aff. Dillon, ¶ 12, Nov. 22, 2010.)

The Carlyle's common elements and first units were completed in November 2006. (Aff. Dillon, at ¶ 16.) As constructed, the Unit's area, "measured on a 'sales' methodology," was 1,229.78 square feet, and measured on a "paint to paint" basis was 1,123.31 square feet. (Aff. of Docs., at Ex. 2.) The second bedroom's dimensions are 12 feet, 2 inches by 8 feet, 1-1/2 inches. (*Id.*) The master bedroom's exterior "window's rough opening is 58 [inches] high and 48

[inches] wide," and "[t]he window frame's actual fabricated dimensions are 55-1/4 [inches] high and 46-3/4 [inches] wide." (*Id.*) Two of the windows in the living/dining room have rough openings of 58 inches wide and 48 inches high, and fabricated dimensions of 55-1/4 inches high by 46-3/4 inches wide. (*Id.*)

### iv.  The Closing and Cancellations

On May 17, 2007, Kelly Brandon, Carlyle Contract Administrator, sent Hammann a "CLOSING NOTICE PURSUANT TO PURCHASE AGREEMENT (CONFIRMATION LETTER) SENT MAY 2007." (Aff. Hammann, Ex. 13; Docket No. 25-14.) The Notice stated that:

> Pursuant to paragraph 19 of your purchase agreement, you will be contacted by a representative of the construction department in order to schedule your walk through of your new home.
>
> Your new home will be substantially complete and closing will occur in **June 27, 2007 at 2:00 p.m.** Custom Home Builders Title, LLC will be the closing company facilitating the closing at the Commercial Partners Title, LLC office. . . .
>
> Custom Home Builders, LLC will be providing you with a copy of your title policy pursuant to paragraph 11 of your purchase agreement sometime within the next few weeks, if you haven't received it already.

(*Id.*) Carlyle never provided Streambend with a title policy. (Compl. at ¶ 35; Answer at ¶ 23.) Dillon states that "[p]rior to Streambend's scheduled closing date, the Carlyle attempted to set up a final walk through of Streambend's Unit; however, Streambend's principal, Jerald Hammann, refused to schedule the walk through." (Aff. Dillon, at ¶ 17.)

On June 4, 2007, Hammann wrote a letter to Brandon and regarding "Lewis Unit Square Footage." (Aff. Yoch, Ex. 11; Docket No. 14-5; Aff. of Docs. Ex. 11.) Hammann stated in the letter that after inspecting a Lewis Unit, he discovered that "[t]he actual square footage for the

Lewis Units . . . is approximately 1,072 square feet, 130 square feet less than the 1,202 represented to me." (*Id.*) Hammann also stated: "The documents represented that the dimensions of the second bedroom were 12'-2" x 11'-0". Based on the construction documents, 12' x 8' is a more accurate representation of these dimensions." (*Id.*)  Hammann requested that Brandon contact him to "find a solution to this problem that everyone can live with." (*Id.*) Hammann resent the June 4, 2007 letter on June 21, 2007. (Aff. of Doc., at Ex. 12.)

At some point, Streambend listed Unit 2904 for sale.[3] (Aff. Dillon, at ¶ 6.) Streambend originally listed Unit 2904 for $719,000 on MLS. (*Id.*at ¶ 7.) On or before June 20, 2007, Streambend dropped the listing price to $529,000. (*Id.* at ¶ 8.) Streambend described the Unit as being 1,202 square feet, with a living room that was 21 feet by 13 feet, a kitchen that was 14 feet by 11 feet, a master bedroom of 13 feet by 13 feet, and a send bedroom that was 12 feet by 11 feet. (*Id.* at Ex. C.) Streambend listed the association dues as $400 per month. (*Id.*) On June 20, 2007, Streambend allowed the listing to expire. (*Id.* at ¶ 8.)

On June 25, 2007, Brandon sent Hammann a letter stating that Carlyle was in receipt of his June 4, 2007 letter, and "[t]he developers are reviewing it and we will provide a response in the very near future." (Aff. of Docs., at Ex. 14.)

On July 20, 2007, Timothy Hassett, an attorney for Carlyle, sent Hammann a letter. (Aff. of Docs., at Ex. 15.) The letter stated: "The closing date for your purchase of Unit No. 2904 at The Carlyle was June 27, 2007, and you failed to close on the purchase of your Unit on that date." (*Id.*) The letter also disputed Hammann's square-footage contentions. The letter concluded by stating: "Please contact me to schedule a closing time for the purchase of your Unit by

---

[3] Streambend does not refute Defendants' implicit contention that the Unit was listed between June 4, 2007, and June 20, 2007.

Wednesday, July 25, 2007. If we do not hear from you by then, we will move forward with a cancellation of the Purchase Agreement." (*Id.*)

On July 24, 2007, Hammann wrote to Hassett, and requested "that you permit entry to the unit [by a] third party I will retain to perform measurements." (Aff. of Docs., at Ex. 16.) Hammann further stated, "If the measurements of the unit and its rooms approximate the dimensions and square footage represented to me prior to entering into the purchase agreement, we will then proceed to schedule a closing for the unit." (*Id.*)

On July 25, 2007, Hassett wrote to Hammann. (Aff. of Docs., at Ex. 17.) Hassett stated that Hammann had "ample time to access [his] unit prior to the scheduling closing date" and "[w]e have been instructed to commence the statutory cancellation of your Purchase Agreement." (*Id.*) The letter noted that Hammann could still schedule a closing. (*Id.*)

Streambend was provided with a Notice of Cancellation of Purchase Agreement for Unit 2904 by notice dated July 27, 2007. (Aff. of Docs., at Ex. 18.) Carlyle served a Notice of Cancellation upon Streambend by filing it with the Minnesota Secretary of State Office on August 10, 2007, and mailed it to Streambend on August 13, 2007, by certified U.S. Mail. (Compl. at ¶¶ 43-44.). In the Notice Carlyle stated that Streambend had defaulted on the agreement by failing to appear and consummate the closing scheduled to take place on "June 22, 2007," and failing to pay the balance of the purchase price and closing costs. (*Id.*) The Notice of Cancellation stated, in part:

> THIS NOTICE IS PURSUANT TO MINNESOTA STATUTES, SECTION 559.217, TO INFORM YOU THAT YOUR PURCHASE AGREEMENT FOR THE (PURCHASE) . . . OF THE ABOVE PROPERTY HAS BEEN CANCELLED . . . . THE CANCELLATION WILL BE CONFIRMED 15 DAYS AFTER SERVICE OF THIS NOTICE UPON YOU . . . UNLESS BEFORE THEN YOU SECURE FROM A DISTRICT COURT AN ORDER THAT THE CONFIRMATION OF

CANCELLATION OF THE PURCHASE AGREEMENT BE SUSPENDED UNTIL YOUR CLAIMS OR DEFENSES ARE FINALLY DISPOSED OF BY TRIAL, HEARING, OR SETTLEMENT.

(*Id.*)

In response, Streambend served to Carlyle its own Notice of Cancellation of Purchase Agreement, dated August 30, 2007. (Aff. of Docs., Ex. 19.) Streambend's Notice of Cancellation was sent to Carlyle care of Hassett. (*Id.*) Streambend's cancellation was based upon Carlyle's breach of the Purchase Agreement, including:

> a. [Carlyle] failed to provide [Streambend] with an approximately 1,202 square foot unit.

> b. [Carlyle] failed to provide [Streambend] with a second bedroom with dimensions of approximately 12'-2' x 11'-0".

> c. [Carlyle] failed to furnish to [Streambend] a copy of any proposed amendments prior to amending the Disclosure Statement.

> d. [Carlyle] failed to provide [Streambend] with a title Commitment prior to the date of closing.

> e. [Carlyle] failed to permit [Streambend] to inspect the Unit to assure that the unit complied with the Purchase Agreement prior to the date of closing.

> f. [Carlyle] failed to provide [Streambend] with a 30-day notice period before effecting cancellation under Minnesota Statutes Section 559.21.

> g. [Carlyle] failed to uphold its obligation of good faith by being dishonest in fact (Minn. Stat. § 515B.1-113.)

> h. [Carlyle] failed to uphold its obligation of good faith by failing to observe reasonable standards of fair dealing.

(*Id.*) Streambend's Notice of Cancellation also stated: "THE CANCELLATION WILL BE CONFIRMED … DAYS AFTER (SERVICE OF THIS NOTICE UPON YOU) . . . ." (*Id.*) Streambend did not serve his cross cancellation upon the party holding earnest money and

11

upgrade deposits. (Aff. Hammann ¶ 9, Dec. 16, 2009.) Along with the Notice of Cancellation, Hammann, on his own behalf, brought a pro se complaint in Hennepin County in which he sought damages, including lost earnest money, lost real estate commissions, and lost profits. *See Hammann v. The Carlyle Condos, LLC*, No. 27-CV-07-17669 (Hennepin County District Court Aug. 31, 2007); (Aff. of Yoch, Ex. 1, Nov. 25, 2009). The state action was dismissed on grounds that Hammann lacked standing to bring the case. (Aff. of Yoch, at Ex. 2.)

### b. Procedural Posture

Based on the aforementioned facts, on August 8, 2009, Streambend file its Complaint. [Docket No. 1.] Streambend's Complaint alleges as follows: Carlyle represented to Streambend that the condominium development would be completed in the spring of 2007 and would include a restaurant; the individual condominium unit would have a specified number of windows each of specified sizes; and the individual condominium unit would have a specified square footage. (Compl. at ¶¶ 18, 22, 26, 36.) The constructed condominium development and individual condominium unit did not conform to these representations. (*Id.* at ¶¶ 19, 25, 29-33, 37-38.) Carlyle also agreed to provide Streambend with a commitment for an American Land Title Association owner's policy of title insurance, which was never provided. (*Id.* at ¶¶ 34-35.) Streambend requested to inspect the condominium unit and this request was denied. (*Id.* at ¶¶ 40-41.) Based upon these allegations, Streambend asserts claims against Carlyle and Opus for violation of the Minnesota Common Interest Ownership Act (MCIOA), Minn. Stat. § 515B.1-101, *et seq.*; violation of Minn. Stat. § 513.52-.60; violation of Interstate Land Sales Full Disclosure Act (ILSFDA), 15 U.S.C. § 1703(a)(2); fraud; and unjust enrichment. [Docket No. 1.] Streambend also brought the following claims against Carlyle: wrongful cancellation, breach of contract, and violation of Minn. Stat. § 559.217(2). [Docket No. 1.]

Defendants filed their Answer on September 8, 2009. [Docket No. 3.] The Answer asserts the following relevant affirmative defenses: unclean hands, waiver, mootness, lack of subject matter jurisdiction, lack of standing, and laches. (Answer ¶¶ 64-67, Sept. 8, 2009.)

On November 25, 2009, Carlyle and Opus filed motions for sanctions and for summary judgment, based upon their assertion that Streambend commenced the present action knowing that this Court lacked subject-matter jurisdiction. [Docket Nos. 9, 11.] Carlyle and Opus argued this Court lacked jurisdiction because Streambend could not maintain a federal claim under the ILSFDA.

On December 17, 2009, Streambend filed Plaintiff's Motion for Partial Summary Judgment. [Docket No. 23.] Streambend sought summary judgment on the following claims: MCIOA, ILSFDA, wrongful cancellation, unjust enrichment, and Minn. Stat. § 559.217(2). [Docket No. 25.]

These motions were referred to the magistrate judge for a Report and Recommendation. [Docket No. 45.] Hearings were held on the motions on February 9, 2010, and February 16, 2010. [Docket Nos. 53, 55.] On May 18, 2010, this Court issued its Report and Recommendation [Docket No. 56], concluding that the transaction at issue fell within the purview of ILSFDA, but Streambend cannot maintain an ILSFDA claim because ILSFDA requires Streambend to show detrimental reliance upon Defendants' alleged representations; detrimental reliance requires that there was Purchase Agreement; and Streambend cannot show there was a Purchase Agreement (and reliance) because the Purchase Agreement was cancelled by both parties. (Report & Recommendation 7-10, May 18, 2010.)  This Court concluded:

> The practical effect of the counter-cancellation by Streambend is twofold. First, the purchase agreement is void and of no further force or effect. . . . Second, counter-cancellation

allows for subsequent judicial determination of entitlement to earnest money payments. . . .

In the absence of a purchase agreement (which has been nullified by the counter-cancellation) there can be no detrimental reliance on either an offer or the terms of a purchase agreement in entering the contract. Reliance is an element of a misrepresentation claim under 15 U.S.C. § 1703(a)(2).  As a matter of law there is no detrimental reliance in this instance because there was no contract.  In any event, plaintiff has presented no evidence to establish an issue of material fact with respect to reliance.  To the extent that the ILSFDA might be construed as a means for recovery of earnest money, the federal statute does not confer jurisdiction because 15 U.S.C. § 1703(a)(2) applies to fraud claims relating to the sale or lease, or offer to sell or lease, property.  There is no underlying purchase agreement; there is no property transaction; and there is no statutory basis upon which federal jurisdiction will stand.  This action should be dismissed for lack of jurisdiction.

(*Id.* at 12-14 (citations omitted).) The Report and Recommendation did not reach any other issues related to the motions for summary judgment, and recommended as follows: Streambend's Motion for Partial Summary Judgment be denied, Defendants' Motion for Summary Judgment be granted, Defendants' motion for sanctions be denied, Streambend's ILSFDA claim be dismissed, and that the federal court decline to exercise supplemental jurisdiction over Streambend's state law claims. (*Id.*)

On August 3, 2010, the United States District Court Judge issued an Order Adopting in Part and Rejecting in Part the Report and Recommendation of the Magistrate Judge. [Docket No. 61.]  The District Court Judge "conclude[d] that proof of actual reliance is not an element of a claim under § 1703(a)(2)(B)." (Order 12, Aug. 3, 2010.) Therefore, the District Court Judge did "not address the remaining objections relating to Carlyle's motions for summary judgment, and [did] not adopt those portions of the Report and Recommendation to which those objections relate." (*Id.* at 5.) But, the District Court Judge concluded that section 1703(a)(2)(B) requires that the purchaser must show that the alleged misrepresentations were material. (*Id.* at 12.)  The

District Court Judge concluded that a genuine issue of material fact exists as to whether Carlyle's allegedly untrue statements and omissions were material. (*Id.* at 13.) The District Court Judge held that Defendants' Motion for Summary Judgment was "DENIED without prejudice," and Streambend's Motion for Partial Summary Judgment was "DENIED." (*Id.* at 16.) The District Court Judge adopted the Report and Recommendation with respect to the denial of the motion for sanctions.

Two months after the Order Adopting in Part and Denying in Part the Report and Recommendation of the Magistrate Judge was issued, Streambend filed the present motion, arguing that Streambend is entitled to summary judgment for its claims under on the MCIOA, ILSFDA, and Minn. Stat. § 559.217(2), as well as for its claims for wrongful cancellation and unjust enrichment. [Docket No. 62.] The motion is nearly identical to Streambend's previous Motion for Partial Summary Judgment.

Carlyle and Opus oppose the present motion, arguing that Streambend's motion constitutes an improper motion for reconsideration, Streambend elected its remedy when it pursued cross-cancellation, Streambend cannot prove materiality, and Streambend has unclean hands.[4]

In connection with the present motion, Streambend filed Plaintiff's Reply Memorandum to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment [Docket No. 74] and Declaration of Jonathan L. R. Drewes [Docket No. 75]. Carlyle

---

[4] Defendants also argue that Streambend's claim under Minn. Stat. § 513.52-.60 fails as a matter of law. Streambend only cites Minn. Stat. § 513.55 within Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment in support of its claim under the MCIOA. [Docket No. 64.] This Court does not read Streambend's second Motion for Partial Summary Judgment to argue that Streambend is entitled to summary judgment on its claim under Minn. Stat. § 513.52-.60. Therefore, in the absence of a motion on Streambend's claim under Minn. Stat. § 513.52-.60, this Court does not consider Defendants' argument that Streambend's motion should be denied with respect to this claim.

and Opus object to Streambend's Reply brief, and moved for sanctions under D. Minn. LR 7.1(e). [Docket No. 76.]

## III.   ANALYSIS

### a.   Defendants' Motion on Streambend's Reply Brief [Docket No. 76]

Opus and Carlyle object to the Plaintiff's Reply brief because it exceeds the word limit permitted by the United States District Court for the District of Minnesota's Local Rules. Streambend's counsel acknowledges that the Reply brief exceeds the cumulative word limit provided in D. Minn. LR 7.1(d). [Docket No. 74].

More troubling is the fact that Streambend filed an additional affidavit and exhibits with its Reply brief. [*See* Docket No. 75.] This practice is expressly prohibited by D. Minn. LR 7.1(d)(3) for the obvious reason that it expands the record and deprives the party responding to a dispositive motion of the opportunity to make arguments on the additional affidavit and exhibits. This violation of the rules is notably egregious because Streambend was previously put on notice that its filings may be in violation of the local rules. (*See generally* Def.'s Response to Pl.'s Obj. June 9, 2010.)

The interests of due process demand that the Declaration of Jonathan L. R. Drewes [Docket No. 75] be stricken from the record. While this Court does not strike Streambend's Reply brief, this Court disregarded those portions of the Reply brief that are based upon the Declaration of Jonathan L. R. Drewes [Docket No. 75]. Furthermore, Streambend is hereby on notice that future violations of the local rules will result in sanctions for Streambend and Streambend's counsel.

**b.  Standard of Review for Motion for Partial Summary Judgment**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).  When a motion for summary judgment has been made and supported by the pleadings and affidavits, the burden shifts to the party opposing the motion to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986).

Prior to reaching the merits of Streambend's Motion for Partial Summary Judgment, this Court must consider four preliminary issues: First, is Streambend's Motion for Partial Summary Judgment an improper motion for reconsideration? Second, was there statutory cancellation of the Purchase Agreement? Third, was the election-of-remedies doctrine affirmatively pleaded? Fourth, if the election-of-remedies doctrine was affirmatively pleaded, is the doctrine triggered by statutory cancellation of a Purchase Agreement?

For the reasons set forth below, this Court concludes that (1) Streambend's motion is in part an improper motion for reconsideration and therefore, this Court does not reach Streambend's ILSFA claims; (2) the election-of-remedies doctrine bars Streambend's motion on all claims in the present motion except for its unjust enrichment claim; (3) there is a genuine issue of material fact with respect to Streambend's unjust enrichment claim; and (4) there is no genuine issue of material fact with respect to Defendants' unclean hands affirmative defense, and therefore, Streambend's unjust enrichment claim is equitably barred. Because this Court does not conclude that Streambend met its burden of showing there is no genuine issue of material fact

regarding Defendants' liability, this Court does not reach Streambend's arguments or factual allegations regarding damages. Therefore, it is hereby recommended that Streambend's Motion for Partial Summary Judgment be denied and Counts I, II, VII, and VIII of Complaint be dismissed with prejudice.

### c. Streambend's Motion for Partial Summary Judgment is in part an improper motion for reconsideration.

Local Rule 7.1(h) states: "Motions to reconsider are prohibited except by express permission of the Court, which will be granted only upon a showing of compelling circumstances." D. Minn. LR 7.1(h). The previous Report and Recommendation on Counter Motions for Summary Judgment and Sanctions only reached the merits of Streambend's ILSFDA claims within Streambend's initial Motion for Partial Summary Judgment. The District Court Judge found that there was a genuine issue of material fact with respect to the ILSFDA claims, and denied Streambend's Motion for Partial Summary Judgment. The District Court Judge did not reach or consider Streambend's arguments with respect to MCIOA, wrongful cancellation, unjust enrichment, or Minn. Stat. § 559.217(2). Likewise, the District Court Judge did not reach or consider Defendants' affirmative election-of-remedies defense.

When a court considers whether a motion is seeking reconsideration, the court must consider both the form and the substance of the alleged offending motion. In terms of form, Plaintiff's present motion is not an impermissible motion for reconsideration simply because it is entitled, "Plaintiff's Motion for Partial Summary Judgment," and Plaintiff's prior motion was entitled "Plaintiff's Motion for Partial Summary Judgment." In terms of substance, Plaintiff's Motion for Partial Summary Judgment is in part an impermissible motion to reconsider and in part a valid motion. Streambend's ILSFDA claims were considered, and the District Court Judge

held that there was a genuine issue of material fact with respect to those claims. For Streambend to bring the present motion for summary judgment on its ILSFDA claims, Streambend is explicitly arguing that there is no genuine issue of material fact with respect to its ILSFDA claims. Thus, Streambend is seeking reconsideration of the District Court Judge's holding without first seeking leave of the court. Streambend has made no argument that there is good cause to reconsider this issue.  Furthermore, Streambend offers no new evidence in support of its motion.  Therefore, this Court shall not consider Streambend's ILSFDA claims.[5] In contrast, because Streambend's state law claims have never been considered on the merits, Streambend's present motion does not constitute an improper motion for reconsideration with respect to these issues.

### d.  The Purchase Agreement was cross cancelled.

#### i.  Defendants are not collaterally estopped from arguing that the Purchase Agreement was cross cancelled.

Collateral estoppel, or issue preclusion, applies if all four of the following elements are met:

> (1) the issues in the prior and present adjudication must be identical; (2) there must have been a final adjudication on the merits; (3) the estopped party must have been a party or in privity with a party to the prior adjudication; (4) and the estopped party must have been given a fair and full opportunity to be heard on the adjudicated issue.

*Haavisto v. Perpich*, 520 N.W.2d 727, 731 (Minn.1994).

---

[5] This conclusion should not be interpreted to bar all further motion practice on the ILSFDA. For example, Defendants' motion was denied without prejudice and there has been no adjudication on the issue of whether Streambend has alleged or can show that there is no genuine issue of material fact regarding the interstate commerce element of ILSFDA. *See Streambend Properties II, LLC v. Ivy Tower Minneapolis*, *LLC*, Civil No. 10-4257 (JNE/AJB), Docket No. 32 (April 14, 2011) (granting the defendants motion to dismiss because the plaintiffs failed to alleged the interstate commerce element of their ILSFDA claims).

Carlyle moved to dismiss Hammann's state court complaint, arguing that Hammann lacked standing to assert claims under the Purchase Agreement. The state district court found that the Purchase Agreement was between Streambend and Carlyle. The state district court also found as follows:

> On August 20, 2007, September 19, 2007, and November 27, 2007, Streambend and [Hammann] executed an assignment of Streambend's interest in the Purchase Agreement to Plaintiff. The November 27, 2007 assignment also purports to assign any interest arising out of the litigation in the instant case, an claim to earnest money held by Streambend, and any interest in other litigation relating to the Unit.

(Aff. Yoch, at Ex. 2.) Based upon these findings, the state district court concluded that the Purchase Agreement explicitly precluded transfer of rights thereunder without both parties' consent and therefore, the "assignments" between Hammann and Streambend could not be used to give Hammann the right to maintain an action under the Purchase Agreement. The state district court implicitly assumed (without deciding) that the Purchase Agreement was in effect because *if the Purchase Agreement was cancelled then there would be no rights under the Purchase Agreement that could be assigned*. Thus, the state district court's holding precluded Hammann from even arguing whether or not the Purchase Agreement was cancelled. Therefore, the issues before the state district court were not the same as those in the present case and there was not a final adjudication of whether the Purchase Agreement was cancelled.

### ii.  Minnesota Statutes section 559.21 is applicable to the present action.

In many respects Minn. Stat. §§ 559.21 and 559.217 "are virtually identical." Larry M. Wertheim, *Minnesota's New Residential Purchase Agreement Cancellation Statute*, 31 WM. MITCHELL L. REV. 687, 702 (2004).  Minnesota Statutes section 559.21, subdivision 2a, provides for statutory termination by the seller of a contract for the conveyance of real estate following

default by the buyer.  Minnesota Statutes section 559.217 provides for the cancellation of a "purchase agreement" for residential real property by a buyer or seller following default.[6]

Minnesota Statutes section 559.21, subdivision 2a, provides sellers with a statutory means to terminate "a contract for the conveyance of real estate or an interest in real estate" when "a default occurs in the conditions of the contract . . . that gives the seller a right to terminate it." The Minnesota Court of Appeals held that a purchase agreement for condominiums is "a contract for the conveyance of real estate or an interest in real estate." *Tran v. Estate of Ditzler*, 411 N.W.2d 6, 8 (Minn. App. 1987). Therefore, the Purchase Agreement between the parties falls within the scope of Minn. Stat. § 559.21.

### iii.   Minnesota Statutes section 559.217 is applicable to the present action.

Minnesota Statutes section 559.217, subdivision 2, states:  "Either the purchaser or the seller may cancel a purchase agreement for residential real property under this section. . . . Either party may later pursue legal remedies at law to recover the earnest money." (Emphasis added.) "'Residential real property' means real property, including vacant land, occupied by, or intended to be occupied by, one to four families as their residence." Minn. Stat. § 559.217, subd. 1(c). The Purchase Agreement at issue falls within the definition of purchase agreement provided by Minn. Stat. § 559.217, subd. 1(b). The residential real property at issue in the present case is Unit 2904 in The Carlyle. *See Wash. Mutual Bank, F.A. v. Elfelt*, 756 N.W.2d 501, 503 (Minn. App. 2008) (referring to a condominium unit as "real property"), *rev. denied* (Minn. Dec. 16, 2008).

---

[6] The operative statute in the present case is Minn. Stat. § 559.217 (2004). The 2004 statute was amended in 2005, but those amendments "applie[d] to purchase agreements entered into on or after [August 1, 2005]." 2005 Minn. Laws ch. 119, sec. 4.

**iv.   There was cross cancellation by the parties.**

The general rule under Minnesota state law is that "[t]he existing statutes and the settled law of the land at the time a contract is made become a part of it and must be read into it except where the contract discloses an intention to depart therefrom." *Wm. Lindeke Land Co. v. Kalman*, 190 Minn. 601, 607, 252 N.W. 650, 653 (Minn. 1934).  But, Minnesota Statutes section 559.21, subdivision 4(a), states:

> The notice required by [Minn. Stat. § 559.21] must be given notwithstanding any provisions in the contract to the contrary, except that earnest money contracts, purchase agreements, and exercised options that are subject to this section may, unless by their terms they provide for a longer termination period, be terminated on 30 days' notice, or may be canceled under section 559.217.

Thus, a seller pursuing statutory termination of a contract for conveyance of real estate must give the notice required to terminate under Minn. Stat. § 559.21—with potentially some modification to the notice period[7]—unless the seller pursues statutory cancellation under Minn. Stat. § 559.217. *Id.* The buyer may only pursue statutory cancellation under Minn. Stat. § 559.217.

To pursue cancellation under Minn. Stat. § 559.217, a party must serve "the party to the purchase agreement" with a specific notice depending upon which form of cancellation the party seeks to pursue.  *Id.* at subds. 3-5. Cancellation under Minn. Stat. § 559.217 occurs in one of three ways. First, if both parties "*initiate*" cancellation proceedings then "the purchase agreement is deemed canceled as of the date the second cancellation notice [was] served." *Id.* (Emphasis added.) Second, if one party pursues a cancellation proceeding with the right to cure, then

---

[7] If there is an earnest money contract, purchase agreement, and exercised option (that is subject to Minn. Stat. § 559.21), and the parties' agreement provided for a period longer than 30 days for notice of termination, then the seller wishing to terminate must modify the notice provided by Minn. Stat. § 559.21 to provide for the specified period (longer than 30 days). *Id.* If the parties' agreement does not provide for a period for notice of termination, then the instrument shall be terminated on a 30 days' notice. *Id.*

the purchase agreement is cancelled unless, within 15 days after the service of the notice upon the other party to the purchase agreement, the party upon whom the notice was served fully complies with the conditions in default and completes the unfulfilled conditions or secures from a court an order suspending cancellation.

*Id.* at subd. 3. Third, if one party pursues a declaratory cancellation, "[t]he cancellation of the purchase agreement is complete, unless, within 15 days after the service of the notice upon the other party to the purchase agreement, the party upon whom the notice was served secures from a court an order suspending cancellation." *Id.* at subd. 4. If under the second or third options, the party receives notice of cancellation and objects to the cancellation, then that party may commence a proceeding to obtain a court order to suspend the cancellation of the purchase agreement. *Id.* at subd. 6.

After cancellation, "[t]he purchase agreement is void and of not further force or effect." *Id.* at subd. 7(a). The only remedy the statute anticipates following cancellation is that *if cross cancellation occurs* the statute specifically permits "[e]ither party . . . to later pursue legal remedies at law to recover the earnest money." *Id.* at subd. 2.

Carlyle elected to pursue declaratory cancellation of the Purchase Agreement pursuant to Minn. Stat. § 559.217, subd. 4. [8] Minnesota Statutes section 559.217, subdivision 4, states:

(a) If default occurs or an unfulfilled condition exists after the date specified for fulfillment in the terms of a purchase agreement for the conveyance of residential real property, which by the terms of the purchase agreement cancels the purchase agreement, either the purchaser or the seller may confirm the cancellation by serving upon the other party and any third party

---

[8] The Purchase Agreement in the present case stated: "If, following termination of this Agreement, Seller is required to cancel this Agreement pursuant to statute due to Buyer's failure to release any purported interest in the Property, the notice period referred to in Minnesota Statutes Section 559.21 shall be 30 days." Carlyle pursued cancellation pursuant to Minn. Stat. § 559.217, subd. 4, which explicitly contains a 15-day notice period. Thus, the 30-day period mentioned in the Purchase Agreement is inapplicable to this Court's analysis.

that is holding earnest money under the purchase agreement a notice:

  (1) specifying the residential real property that is the subject of the purchase agreement, including the legal description;

  (2) specifying the purchase agreement by date and names of parties, and the unfulfilled condition or default; and

  (3) stating that the purchase agreement has been canceled.

 (b) The notice must be served in the manner provided in section 559.21, subdivision 4, paragraphs (a) and (b).

 (c) The cancellation of the purchase agreement is complete, unless, within 15 days after the service of the notice, the party upon whom the notice was served secures from a court an order suspending the cancellation.

In addition to the aforementioned requirements, the notice must contain the language in Minn. Stat. § 559.217, subd. 5(b).

 The Purchase Agreement at issue stated: "[I]f the Buyer's default involves a failure to attend and consummate the closing on the Date of Closing scheduled by Seller, then Seller may terminate this Agreement immediately." (Compl. Ex. 1, ¶ 20A; Docket No. 1-1.) The plain and unambiguous reading of this statement is that it describes a default which by the terms of the Purchase Agreement cancels the Purchase Agreement. Obviously, there can be no Purchase Agreement if the buyer will not complete the purchase. Carlyle informed Streambend on July 20, 2007, that it would initiate statutory cancellation. This warning was repeated on July 25, 2007. Carlyle's Notice of Cancellation was served on Streambend.[9] In addition to stating, "THIS NOTICE IS PURSUANT TO MINNESOTA STATUTES, SECTION 559.217, TO INFORM YOU THAT YOUR PURCHASE AGREEMENT FOR THE (PURCHASE) . . . OF THE

---

[9] The record before this Court does not include an affidavit of service. Nevertheless, Streambend alleges that Carlyle served a Notice of Cancellation upon Streambend by filing it with the Minnesota Secretary of State Office on August 10, 2007, and mailing it to Streambend on August 13, 2007, by certified U.S. Mail. The Hennepin County District Court found that Carlyle served Streambend with a notice of cancellation of the Purchase Agreement on August 10, 2007.

ABOVE PROPERTY HAS BEEN CANCELLED . . . ," the Notice of Cancellation was entitled "Notice of Cancellation of the Purchase Agreement." Therefore, Carlyle's Notice of Cancellation comports with the content requirements of section 559.217, subdivisions 4 and 5(b).

Streambend also served its own Notice of Cancellation. Streambend did not pursue a judicial remedy in response to Carlyle's notice of statutory cancellation and Streambend waived any opportunity to challenge Carlyle's cancellation.

There is nothing in the record to support the finding that either party served "any third party that is holding earnest money under the purchase agreement." Minn. Stat. § 559.217, subd. 4(a). But, the cross-cancellation provision of the statute does not require such a finding. Minnesota Statutes section 559.217, subdivision 2, states:

> If either a seller or purchaser *initiates* a cancellation proceeding under this section and before completion of the proceeding the other party *initiates* a cancellation proceeding under this section . . . , the purchase agreement is deemed canceled as of the date the second cancellation notice is served upon the other party under this section.

(Emphasis added.)  Both parties to this action "initiat[ed]"[10] cancellation at the time they served their Notices of Cancellation upon each other.[11]  Therefore, there is no genuine issue of material fact that the Purchase Agreement was cancelled by cross cancellation as of August 30, 2007.

---

[10] This Court reads "initiates" according to its "common and approved usage" as directed by Minn. Stat. § 645.08(1).

[11] The reason for serving notice on the party holding earnest money, under subdivisions 3 and 4, is that "earnest money held under the purchase agreement must be distributed to, and become the sole property of, the party *completing* the cancellation of the purchase agreement." Minn. Stat. § 559.217, subd. 7(a) (emphasis added). Under the cross-cancellation provision, neither party "complet[es]" cancellation. *Id.* Both parties "initiate" cancellation, and the combined effect of both parties initiating cancellation is statutory cancellation of the purchase agreement. *Id.* at subd. 2. Cross cancellation expressly bars direct distribution of earnest money. *Id.* at subd. 7(a).

### e.   Impact of cross cancellation

The impact of cross cancellation was twofold. First, the parties were "placed in the position as if the contract had never existed in the first place." Wertheim, 31 WM. MITCHELL L. REV. at 702; *see* Minn. Stat. § 559.217, subd. 7(a) (stating "[a]fter a cancellation . . . the purchase agreement is void and of no further force or effect"). Thus, all rights under the purchase agreement are terminated. *Zirinsky v. Sheehan*, 413 F.2d 481, 48-485 (8th Cir. 1969). Second, "the issue of who is entitled to earnest money" was to be decided by judicial action. Wertheim, 31 WM. MITCHELL L. REV. at 704; Minn. Stat. § 559.217, subd. 2.

### f.   Election of remedies was pleaded as an affirmative defense.

The Eighth Circuit Court of Appeals held: "Election of remedies is a defense which, to be available must be pleaded." *Henderson Tire & Rubber Co. v. Gregory*, 16 F.2d 589, 592 (8th Cir. 1926). Carlyle and Opus failed to explicitly plead election of remedies as an affirmative defense. Nevertheless, Carlyle and Opus affirmatively pleaded waiver. Waiver can be effectuated by election of remedies.[12] *See* BLACK'S LAW DICTIONARY, *waiver by election of remedies* (9th ed. 2009) (defining "waiver by election of remedies" as "[a] defense arising when a plaintiff has sought two inconsistent remedies and by a decisive act chooses one of them, thereby waiving the other"). Carlyle and Opus have pursued an election-of-remedies affirmative defense from the outset of this case and have asserted that Streambend's cancellation constituted a waiver of the present claims. (*See* Def.'s Mem., at 11, Nov. 25, 2009; [Docket No. 13].) "Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). Therefore, this Court construes Carlyle and Opus's Answer to have affirmatively pleaded election of remedies.

---

[12] Carlyle and Opus also pleaded mootness as an affirmative defense. (Answer ¶ 64, Sept. 8, 2009.) Like waiver, the defense of mootness can be related the election-of-remedies doctrine if the application of the doctrine bars a claim. *Cf. Grannes v. Red Cedar of Yellow Medicine, Inc.*, No. A04-1264, 2005 WL 949059, *5 (Minn. App. April 26, 2005) (referring to a mootness argument as related to an election-of-remedies argument).

**g. The election-of-remedies doctrine is inapplicable to Streambend's unjust enrichment claim and applicable to all other claims in Streambend's Motion for Partial Summary Judgment.**

The Minnesota Court of Appeals has described the election-of-remedies defense as follows:

> The doctrine of election of remedies applies when a party adopts two or more inconsistent remedies and is designed to prevent double redress for a single wrong. A party is bound by an election of remedies when he has pursued a chosen course of action to a determinative conclusion or has procured an advantage therefrom.

*First Bank Nat. Ass'n v. Northside Mercury Sales & Service, Inc.*, 458 N.W.2d 424, 428 (Minn. App. 1990), *rev. denied* (Minn. Sept. 28, 1990). *See also Henderson Tire & Rubber Co.*, 16 F.2d at 593 (stating the "essential elements of the doctrine [of election of remedies]"). To determine if the election-of-remedies doctrine applies to the present case, this Court must consider whether Minnesota Statutes section 559.217 provides a remedy inconsistent with Streambend's MCIOA, wrongful cancellation, unjust enrichment, and Minn. Stat. § 559.217(2) claims.

Sections 559.21 and 559.217 are in many ways analogous, such that interpretation of one statute can aid in the interpretation of the other. These statutory cancellation provisions are "'in addition to and not exclusive of, cancellation by judicial action.'"[13] *Glenwood Investment Properties, L.L.C. v. Carroll A. Britton Family Trust*, 765 N.W.2d 112, 117 (Minn. App. 2009) (quoting *O'Meara v. Olson*, 414 N.W.2d 563, 567 (Minn.App.1987)); *see also Miller v. Snedeker*, 257 Minn. 204, 219, 101 N.W.2d 213, 225 (Minn. 1960) (stating that Minn. Stat. § 559.21 is "the method by which, unaided by litigation, the vendor may cancel the contract when the purchaser defaults"); *Tarpy v. Nowicki*, 286 Minn. 257, 262, 175 N.W.2d 443, 447

---

[13] Defendants to this action did not assert a counterclaim for declaratory cancellation. Likewise, Defendants have not asserted or argued abandonment.

(Minn. 1970) (stating that "in the absence of abandonment by the vendee or resort to judicial proceedings, the method prescribed by statute is the exclusive method by which the vendor can terminate a contract for deed").

The Eighth Circuit Court of Appeals has considered Minn. Stat. § 559.21, and held that "once statutory notice [of termination] has been served and cancellation effected, all rights under the contract are terminated." *Zirinsky*, 413 F.2d at 48-485. "The rationale behind these rules is that the contract is no longer in existence and that any cause of action based upon the contract itself has been terminated." *Id.* at 485. Thus, the Eighth Circuit Court of Appeals stated:

> [S]tatutory notice of cancellation once served and effected constitutes an election by the vendor as to the rights he chooses to pursue upon the vendee's default. It not only brings the contract to an end, but it also terminates his rights to sue for general damages at common law. And conversely, once a vendor chooses to pursue his common law action for damages he cannot later effect cancellation by statutory notice.

*Id.*; *see also Rudnitski v. Seely*, 452 N.W.2d 664, 666 (Minn. 1990) (holding that statutory cancellation under Minn. Stat. § 559.21 is an election of remedies). This Court is bound by the holding of the Eighth Circuit Court of Appeals and the highest court of the state concerning the acceptable interpretation of state law. *See Hillside Enterprises, Inc. v. Continental Carlisle*, Inc., 147 F.3d 732, 735 (8th Cir. 1998). Furthermore, there is no reason for concluding that the Eighth Circuit Court of Appeals' holding should not be applied to Minn. Stat. § 559.217. In fact, this was the presumptive interpretation of Minn. Stat. § 559.217 in 2004 when the statute was enacted. *See* Wertheim, 31 WM. MITCHELL L. REV. at 702 (stating that "like section 559.21 terminations, cancellation under the two new procedures cancels the contract, making it void and of no further force or effect"). Thus, this Court concludes that the election-of-remedies doctrine could apply to the present case.

Although application of Minn. Stat. §§ 559.21 and 559.217 serves as an election of remedies for claims under the negotiated instrument, statutory cancellation does not bar an action to recover monies paid before default. *Zirinsky*, 413 F.2d at 486; Minn. Stat. § 559.217, subd. 2. The Eighth Circuit Court of Appeals recognized that a party could bring an unjust enrichment claim to recover earnest monies. *Id.*; *see also Fort Dodd Partnership v. Trooien*, 392 N.W.2d 46, 48 (Minn. App. 1986) (holding statutory cancellation does not preclude a suit for unjust enrichment).   Minnesota Statutes section 559.217, subdivision 2, provides that a party may pursue "legal remedies at law" to recover earnest monies.

Turning to Streambend's claims, this Court first notes that it does not consider whether statutory cancellation under state law serves as an election of remedies barring a plaintiff from pursuing claims under ILSFDA because this Court does not reach Streambend's ILSFDA claims. Second, for the reasons stated above, Streambend's claim for unjust enrichment is not barred by the election-of-remedies doctrine.

Third, Streambend's claim under Minn. Stat. § 559.217, subd. 2, is barred. However, this Court does not need to reach the election-of-remedies doctrine analysis for this claim because Minn. Stat. § 559.217, subd. 2, does not create an independent cause of action. Minnesota Statutes section 559.217, subdivision 2, merely states that a party may pursue "legal remedies at law" to recover earnest monies.

Fourth, Streambend's wrongful cancellation claim is barred by the election-of-remedies doctrine. Minnesota Statutes section 559.217, subdivision 6, provided that in order to challenge a notice of statutory cancellation the party must bring an action under Minn. Stat. § 559.211 "prior to the effective date of termination."   Streambend did not bring an action under Minn. Stat. § 559.211 and therefore, waived any claims under the Purchase Agreement. *See Brickner v. One*

*Land Development Co.*, 742 N.W.2d 706, 711 (Minn. App. 2007) (holding that a cause of action for wrongful cancellation is waived by failing to take action under Minn. Stat. § 559.211).

Finally, Streambend's MCIOA claim is barred by the election-of-remedies doctrine. Streambend's MCIOA claim consists of three subparts: Streambend asserts that Defendants violated the good faith and fair dealings provision of the MCIOA, Minn. Stat. § 515B.1-113[14]; Streambend asserts that Defendants violated the disclosure statement provision of the MCIOA, Minn. Stat. § 515B.4-102[15]; and Streambend asserts that Defendants violated the express warranties provision of the MCIOA, Minn. Stat. § 515B.4-112.[16] Carlyle and Opus argue that Streambend cannot maintain a claim under the MCIOA because Streambend could no longer seek relief under the MCIOA when it cross-cancelled the Purchase Agreement. Specifically, Defendants argue that because there was no contract following cancellation, Streambend was not a "purchaser" within the meaning of chapter 515B.[17]

Under the MCIOA, a "'[p]urchaser' means a person, other than a declarant, who by means of voluntary transfer acquires a legal or equitable interest in a unit." Minn. Stat. § 515B.1-103. The MCIOA also states:

---

[14] Minn. Stat. § 515B.1-113 states "Every contract or duty governed by this chapter imposes an obligation of good faith in its performance or enforcement."

[15] Minn. Stat. § 515B.4-102(a)(5) requires that a disclosure statement to "fully and accurately disclose . . . declarant's schedule of commencement and completion of construction of any buildings and other improvements that the declarant is obligated to build pursuant to section 515B.4-117." Minn. Stat. § 515B.4-101(b) states in part: "The declarant shall be liable to the purchaser to whom it delivered the disclosure statement for any false or misleading statement set forth therein or for any omission of a material fact therefrom."

[16] Minn. Stat. § 515B.4-112(a)(1)-(2) states the conditions under which "[e]xpress warranties made by a declarant or an affiliate of a declarant to a purchaser of a unit, if reasonably relied upon by the purchaser, are created . . . ."

[17] Defendants do not contest Streambend's contention that Defendants are declarants within the meaning of chapter 515B.

> In addition to any other rights to recover damages, attorney's fees, costs or expenses, whether authorized by this chapter or otherwise, if a declarant . . . violates a provision of this chapter . . .  any person . . . adversely affected by the failure to comply has a claim for appropriate relief.

Minn. Stat. § 515B.4-116(a).  The remedies provided by the MCIOA are "not exclusive and do not abrogate any remedies under other statutes or the common law." *Id.* at § 4-116(c). The "rights conferred by [the MCIOA] may not be waived" unless expressly provided by the MCIOA and "[a] declarant may not . . . use any other device . . . to evade the limitations or prohibitions of this chapter or the declaration." *Id.* at § 515B.1-104. The MCIOA also states that "[t]he principles of law and equity, including . . . the law of real property . . . supplement the provisions of this chapter, except to the extent inconsistent with this chapter." *Id.* at § 515B.1-108. Finally,

> (a) The remedies provided by [the MCIOA] shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed.
>
> (b) Any right or obligation declared by this chapter is enforceable by judicial proceeding, unless the provision declaring it provides otherwise.

*Id.* at § 515B.1-114.

Section 515B.4-116(a) is consistent with the "longstanding law in Minnesota" that statutory cancellation—under sections 559.21 or 559.217—terminates all rights under the contract. *Gatz v. Frank M. Langenfeld & Sons Constr. Inc.*, 356 N.W.2d 716, 718 (Minn. App. 1984). Section 515B.4-116(c) states that the MCIOA's remedies are "not exclusive and do not abrogate any remedies under other statutes or the common law."  Thus, the MCIOA expressly permits a buyer or seller to pursue statutory cancellation under Minn. Stat. §§ 559.21 or 559.217. The effect of statutory cancellation is clear: Following statutory cancellation of the contract, there is no contract under which to maintain a claim. Following cancellation, a buyer to a

cancelled contract cannot be said to have "acquire[d] a legal or equitable interest in a unit." Minn. Stat. § 515B.1-103. Therefore, a buyer in a cancelled contract cannot be said to be a "purchaser" within the meaning of the MCIOA. *Id.* A buyer in a cancelled contract cannot be said to be aggrieved by the failure of a declarant to honor its statutory obligations to the buyer as if it were a "purchaser." Thus, the MCIOA expressly provides buyers with the opportunity to waive rights provided by the MCIOA by pursuing statutory cancellation, under Minn. Stat. §§ 559.21 and 559.217.

The aforementioned reading of the MCIOA is consistent with the legislative intent for the statute because it gives "effect to all [of the MCIOA's] provisions." Minn. Stat. § 645.16. The MCIOA's explicitly distinguishes "prospective purchasers" from "purchasers." *Compare* Minn. Stat. § 515B.4-101(b) *and id.* at § 515B.4-112(a)(1)-(2) *with id.* at § 515B.4-117. The MCIOA protects "prospective purchasers" from certain forms of promotional materials. *Id.* at § 515B.4-117. The MCIOA protects prospective purchasers from false or misleading statements within and omissions of material facts from the mandatory disclosure statement. *Id.* at § 515B.4-101(b). Likewise, the MCIOA protects purchasers who reasonable rely upon "express warranties." *Id.* at § 515B.4-102. This distinction is logical because a "prospective purchaser" has not acquired the statutory right to receive a disclosure statement and cannot be said to have relied upon any express warranties.   An alternative reading of section 515B.4-116(a) would render this distinction meaningless and lead to absurd results. A "prospective purchaser" cannot be "adversely affected" by a declarant's violations of sections 515B.4-102 (disclosure statement provision) and 515B.4-112 (express warranties). After a contract is terminated the buyer (under the terminated contract) is neither a "prospective purchaser" nor a "purchaser" and cannot be

said to have the rights of a "purchaser" within the meaning of the MCIOA nor can the buyer be said to have been adversely affected by a violation of the MCIOA's protections for purchasers.

For the reasons set forth above, Streambend's claims under Minn. Stat. § 559.217, subd. 2, under the MCIOA, and for wrongful cancellation are barred. Therefore, this Court recommends that Counts I (MCIOA), II (wrongful cancellation), and VIII (Minn. Stat. § 559.271(2)) of Complaint [Docket No. 1] be dismissed with prejudice.

### h.  Unjust Enrichment

"A party asserting an unjust-enrichment claim must establish that the defendant knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." *Hamann v. Park Nicollet Clinic*, 792 N.W.2d 468, 472-73 (Minn. App. 2010) (quotation omitted).  "Unjust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *ServiceMaster of St. Cloud v. GAB Business Services, Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (quotation omitted).  "The theory of unjust enrichment or money had and received has been used to support claims based upon failure of consideration, fraud in the inducement of the contract, mistake, or other situations where it would be morally wrong for one party to enrich itself at the expense of others."  *Fort Dodd Partnership v. Trooien*, 392 N.W.2d 46, 48 (Minn. App. 1986).

Streambend makes the following argument in relation to its unjust enrichment claim: "Because Defendants could sell units similar to what they had promised to provide Plaintiff for several hundred thousand dollars more than Plaintiff had contracted to pay, Defendants were unjustly enriched by the cancellation of Plaintiff's equitable title within the development." (Pl.'s

Mem. 47, Oct. 1, 2010.) For the reasons set forth below, this Court recommends that Streambend's motion for summary judgment be denied on this issue.

First, Streambend has made no showing to support that there was a quasi-contract between Streambend and Opus, or that Opus received any benefit—justly or unjustly—from Streambend. Second, Streambend's argument quoted above seems to be based upon the implicit assumption that the actual Unit was materially different from the Unit described in the Purchase Agreement. As held in the Order Adopting in Part and Rejecting in Part the Report and Recommendation of the Magistrate Judge, there is a genuine issue of material fact as to whether the representations by Carlyle as to the specifications of the Unit Streambend agreed to purchase materially differed from the actual Unit that Carlyle tendered at the closing. Nothing in the record has changed with respect to this issue. (*Compare* Aff. of Docs., Dec. 16, 2009; Docket No. 25-1 to 25-23 *with* Aff. of Docs., Dec. 16, 2009; Docket No. 65.) Therefore, Streambend has failed to show that there is no genuine issue of material fact as to its unjust enrichment claim.

### i. Unclean Hands

The unclean-hands doctrine derives from the maxim "he who seeks equity must do equity, and he who comes into equity must come with clean hands." *Peterson v. Holiday Recreational Industries, Inc.*, 726 N.W.2d 499, 505 (Minn. App. 2007) (quotation omitted). This "maxim[] operate[s] to deny relief to or from conduct which is fraudulent, illegal, or unconscionable." *Johnson v. Freberg*, 178 Minn. 594, 597, 228 N.W. 159, 160 (Minn. 1929). "The plaintiff may be denied relief where his conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others." *Id.* at 597-98, 228 N.W. at 160. Nevertheless,

> adverse equity must grow out of the very controversy before the court or out of such transactions as the record shows were part of

> its history, or where it is so connected with the cause in litigation as to be presented in the pleadings and proofs, with full opportunity afforded to the plaintiffs to explain or refute the charges.

*Lindell v. Lindell*, 150 Minn. 295, 299, 185 N.W. 929, 930 (1921). The United States Supreme Court has held that "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815, 65 S. Ct. 993, 997-98 (1945).

The United States Supreme Court has held that "where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions." *Precision Instrument Mfg. Co.*, 324 U.S. at 815, 65 S. Ct. at 998; *see, e.g.*, *United States v. Felici*, 208 F.3d 667, 670-71 (8th Cir. 2000) (stating "[t]he doctrine of unclean hands is an equitable doctrine that allows a court to withhold equitable relief if such relief would encourage or reward illegal activity"). A plaintiff's unconscionable conduct towards third parties can bar its claim for equitable relief from a defendant. *McFerren v. B & B Inv. Group*, 253 Mich. App. 517, 524, 655 N.W.2d 779, 784 (Mich. App. 2002); *Osborne v. Nottley*, 206 Or. App. 201, 205, 136 P.3d 81, 83 (Or. App. 2006); *see, e.g., Haagen-Dazs, Inc. v. Frusen Gladje, Inc.*, 493 F. Supp. 73, 76 (S.D.N.Y. 1980) (holding that the unclean-hands doctrine barred plaintiff's claim that defendant misrepresented that its ice cream was Scandinavian, when plaintiff misrepresented that its ice cream was Swedish).

The Minnesota Supreme Court has held that when the affirmative defense of unclean hands is premised upon a claim of misrepresentation by the plaintiff upon the defendant that there must be a showing of reliance before the unclean hands affirmative defense is cognizable. *Fred O. Watson Co. v. U. S. Life Ins. Co. in City of New York*, 258 N.W.2d 776, 778 (Minn.

1977). The Minnesota Supreme Court also stated that "[t]he misconduct need not be of such a nature as to be *actually* fraudulent." *Johnson*, 178 Minn. at 597-98, 228 N.W. at 160. The Minnesota Supreme Court has not considered a case in which the affirmative defense is based upon a misrepresentation to third parties that fails to induce reliance. Nevertheless, there are strong public policy reasons for concluding that the Minnesota Supreme Court would not conclude that it is an abuse of discretion to not require reliance by third parties when faced with the facts before this Court.

Opus and Carlyle contend that Streambend's equitable unjust enrichment claim is barred because Streambend comes to its claim with unclean hands. Opus and Carlyle's affirmative defense is based upon the allegation that, assuming arguendo that Streambend's misrepresentations claims are true, Streambend listed the Unit for sale to third-parties using the same misrepresentations made by Carlyle.

Assuming that Streambend's misrepresentation claims are true, there is no genuine dispute of fact regarding the following facts: At the same time that Streambend represented that it believed that Carlyle made misrepresentations of the Unit's dimensions to Streambend, Streambend was attempting to sell the Unit for a profit based upon those misrepresentations. The record supports that Streambend was unaware of the discrepancy between Carlyle's representations and the actual Unit dimensions until June 4, 2007, when Hammann wrote to Brandon.[18] On June 21, 2007, Hammann re-sent the June 4, 2007 letter to Brandon. Streambend let the MLS listing for the Unit expire on June 20, 2007. Furthermore, Streambend originally listed Unit 2904 for $719,000 and dropped the listing price to $529,000. There is nothing in the MLS listing to giving prospective third-party buyers notice that Streambend was involved in a

---

[18] Defendants state in their memorandum that there is additional evidence in Hammann's deposition, but the cited pages were not filed in support of the motion.

dispute with Carlyle concerning the dimensions of the Unit or that the dimensions of the Unit were approximations. The record is clear that Streambend was attempting to perpetrate Carlyle's (alleged) fraud onto unsuspecting third parties.  Streambend's bad motive is evident; Streambend attempted to pass along a fraud onto a third party for a profit rather than pursue legal remedies available to it.  This action shocks the conscience and raises public policy concerns because passing along a misrepresentation to a third party should not be encouraged as a means of avoiding the costs of a contract dispute.

Streambend's responsive argument seems to support Defendants' claim more than refute it. Streambend argues that

> [Streambend's] owner created the MLS listing in question by copying an existing listing for a Lewis unit placed on the MLS by the [Defendants'] real estate broker. Therefore, Plaintiff's owner did not enter either the amount of association dues or the square footage of the unit, but instead left them as disclosed by the [Defendants'] real estate sales broker.

(Pl.'s Reply 5-6, Dec. 3, 2010.) As far as a representation of fact is concerned, self-serving statements in a brief cannot refute an offer of proof by the opposing party. *See Bacon v. Hennepin Cnty. Med. Ctr.,* 550 F.3d 711, 716 (8th Cir.2008) (stating that a plaintiff must substantiate factual contentions with more than self-serving affidavits). Furthermore, whether Hammann electronically copied and pasted Defendants' misrepresentations to him or retyped them is immaterial given that Streambend believed the dimensions to be inaccurate and repeated those dimensions to prospective buyers without reservation.

Streambend also argues that it suspected that Defendants misrepresented the dimensions as early as February 2007 but did not change the listing because Streambend was not "certain of the falsity" of the dimensions until the week of June 4, 2007. (Pl.'s Reply at 6.) Streambend also contends that it removed the listing on June 20, 2007, because of the false information it

apparently contained. Again, these contentions are self-serving and not supported by the evidence in the record. This Court makes no finding of unclean hands by Streambend for actions after June 20, 2007. But, the June 21, 2007 letter supports that Streambend believed the measurements to be misrepresented from June 4, 2007, through June 20, 2007, and Streambend continued to list the Unit using the misrepresentations during this period.

Therefore, as a matter of equity, Streambend's unconscionable conduct bars Streambend from pursuing an equitable remedy and this Court recommends that Count VII (unjust enrichment) within Streambend's Complaint be dismissed with prejudice.

## IV.   ORDER

Based upon the record, memoranda, and oral arguments of counsel, **IT IS HEREBY ORDERED** as follows:

1. Defendants' Objection to Plaintiff's Reply Brief [Docket No. 76] is **GRANTED IN PART** and **DENIED IN PART**; and

2. The Declaration of Jonathan L. R. Drewes and Exhibits [Docket No. 75] are **STRICKEN**.

## V.   RECOMMENDATION

Based upon the record, memoranda, and oral arguments of counsel, **IT IS HEREBY RECOMMENDED** as follows:

1. Plaintiff's Partial Motion for Summary Judgment [Docket No. 62] be **DENIED**; and

2. Counts I (MCIOA), II (wrongful cancellation), VII (unjust enrichment), and VIII (Minn. Stat. § 559.217) be **DISMISSED WITH PREJUDICE**.

Dated:_____4/18/11_____

_____s/ Arthur J. Boylan_____
Chief Magistrate Judge Arthur J. Boylan
United States District Court

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before __May 3, 2011_____.